**In re WATER'S EDGE LIMITED PARTNERSHIP, Debtor.**

**No. 98–41442 JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

July 21, 2000.

2

Kara J. Lane, Mark S. Baldwin, Brown, Rudnick, Freed & Gesmer, P.C., Hartford, CT, Michael R. Pinta, Rappaport, Pinta & Eggert, LLP, Boston, MA, Steven D. Pohl, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Debtor.

## Decision

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case presents the question whether counsel to a debtor in possession is "disinterested" or holds an "interest adverse to the estate" within the meaning of section 327(a) of the Bankruptcy Code. The question arises primarily because of counsel's prior representation of a party who sponsored and funded the debtor's plan of reorganization. Its resolution depends in part upon a somewhat neglected aspect of the responsibilities of a debtor in possession— whether it has fiduciary obligations concerning the payment it proposes to make under its chapter 11 plan. The matter is here on remand from the United States District Court for the District of Massachusetts from an appeal by Beal Bank, S.S.B. ("Beal") of this court's order denying Beal's motion to disqualify the law firm of Brown, Rudnick, Freed & Gesmer, P.C. ("BRF & G") as counsel for the Debtor, Water's Edge Limited Partnership. In its decision of April 11, 2000, the District Court remanded Beal's motion to disqualify BRF & G to this court for further findings and conclusions on: (1) whether BRF & G should have been disqualified based on the appearance of a conflict or an actual conflict; (2) whether there are independent procedural grounds that preclude disqualification of BRF & G; and (3) whether any sanctions, including the disal-

lowance of BRF & G's fees, are appropriate. I conclude that BRF & G at all times acted properly and had no conflict of interest.

### Procedural Background

On March 3, 1998, Water's Edge Limited Partnership (the "Debtor" or "WELP") filed a petition for relief under chapter 11 of Title 11 of the United States Code. It thereafter operated as a debtor in possession. On that same date, the Debtor filed its application to employ BRF & G as its bankruptcy counsel. On behalf of BRF & G, Attorney William R. Baldiga signed the verified statement required by Federal Rule of Bankruptcy Procedure 2014. In that statement Attorney Baldiga made the following disclosures, among others:

(a) BRF & G has represented the Applicant [The Debtor] before the commencement of this case in connection with the Applicant's unsuccessful efforts to effect an out-of-court restructuring of its debts, prepetition litigation brought by Beal Bank (the Applicant's major lender), evaluating options to Chapter 11, and related matters. The Applicant has paid all of BRF & G's prepetition fees and expenses.

(b) BRF & G has represented, and continues to represent, Evelyn M. Carabetta ("EMC") in connection with certain limited matters not related to the Applicant or this case. EMC is the daughter of Joseph F. Carabetta ("JFC"), who is the sole shareholder of Carabetta Enterprises, Inc. ("CEI"). JFC and CEI are the Applicant's two general partners (and debtors in Chapter 11 cases pending in Bridgeport, Connecticut in which debtor-sponsored plans were confirmed in September 1997). The matters as to which BRF & G has represented EMC are with respect to EMC's claims against JFC's and CEI's estates, claims made or threatened against EMC arising from previous business dealings unrelated to the Applicant or this case, and preparation of a prenuptial agreement.

BRF & G's representation of EMC with respect to each of those matters is largely completed. EMC is not a creditor, interest holder or party in interest in this case. EMC is an employee of Carabetta Management Company ("CMC"), the management company affiliated with CEI that manages the Applicant's real property.

. . .

(d) BRF & G has represented Parham Pouladdej or entities controlled by him ("PP") in connection with certain limited matters unrelated to the Applicant and this case, including with respect to PP's purchase of a mortgage loan payable by CEI to a Fidelity Investments fund and the subsequent acquisition of that collateral (an apartment building adjoining one of the Applicant's properties) and PP's purchase of certain real property from the estate of a CEI subsidiary (Meadow Haven Inc.). PP is not a creditor, interest holder or party in interest in this case. (PP was the holder of a claim against the Applicant until shortly before the commencement of this case, but, upon information and belief, has sold such claim to an unrelated third party). PP is engaged to be married to EMC and has committed to fund a plan or reorganization in this case on certain terms and conditions. PP is represented by independent counsel with respect to any plan he may sponsor in this case. In or about August, 1997, BRF & G represented both the Applicant and PP at one meeting with Beal Bank, the purposes of which was to permit CEI to introduce PP as a potential investor in or purchaser of the Applicant's properties; however, BRF & G has not since, and did not before, such meeting represent PP in connection with the Applicant or this case. I do not believe that PP holds any interest adverse to the Applicant or its estate in any respect.

WELP filed its reorganization plan on March 23, 1998, twenty days after the

**4**

filing of its chapter 11 petition and the accompanying application to employ BRF & G.[1] The plan stated it would be funded by an equity investment from Parham Pouladdej ("Pouladdej"), the plan's sponsor, that Pouladdej would become WELP's sole general partner in exchange for his investment of up to $1 million, and that Pouladdej would have the right to designate additional general and limited partners of the reorganized debtor.[2] The plan also stated that none of the partners of the reorganized debtor would be the Debtor or its existing partners or affiliates.

On April 3, 1998, Beal filed its objection to the employment application, not knowing that an order had been entered the previous day approving BRF & G's employment. On April 9, 1998, Beal filed a motion requesting reconsideration of the order granting the application to employ BRF & G. This motion was denied on April 15, 1998.

On April 30, 1998, Beal filed its motion for disqualification, requesting disqualification of BRF & G as counsel for the Debtor due primarily on the firm's alleged conflict of interest by virtue of its prior representation of insiders. Beal's motion for disqualification was denied on June 1, 1998 after a nonevidentiary hearing was held.

Beal timely appealed to the District Court. On appeal, the District Court remanded for further findings and conclusions on the three matters previously set forth. *See Beal Bank v. Waters Edge Ltd. Partnership*, 248 B.R. 668 (D.Mass.2000).

### Factual Background

The Debtor, WELP, is a Massachusetts limited partnership which owns and operates three apartment buildings in the Water's Edge Complex (Nos. 1, 2, and 5) in Revere, Massachusetts. Carabetta Enterprises, Inc. ("CEI") is a 97.5% general partner. Joseph F. Carabetta, the sole stockholder of CEI, is a 2% general partner. Ralph Carabetta, Joseph's brother, is the sole limited partner, holding a .5% interest. CEI is the only stockholder of Carabetta Management Company ("CMC"), the manager of the three buildings.

Evelyn Carabetta is the daughter of Joseph F. Carabetta and the wife of Parham Pouladdej. She is an employee of CMC and has served as onsite property manager of the three buildings. Evelyn Carabetta, through Water's Edge Management Corporation, a corporation she controls, also manages the apartment building located at 394 Ocean Avenue (Building 6), which is adjacent to the Debtor's three buildings. Building 6 is owned by First Tower Funding L.L.C., which in turn is owned by Pouladdej, the plan sponsor in this chapter 11 case.

Beal is the primary secured creditor of the Debtor, holding first and second mortgages against the Debtor's property securing total indebtedness of $29,480,495.30 as of the date the bankruptcy case was filed.

BRF & G has served as counsel for the Debtor throughout this chapter 11 case. BRF & G also represented Pouladdej and other insiders prior to the Debtor's bankruptcy filing in connection with Pouladdej's attempts to purchase Debtor's property. The prior representation of Pouladdej is at

---

1. The plan was amended on May 4, 1998. The amended plan was modified on June 24, 1998 and again on June 29, 1998. It was confirmed on July 2, 1998.

2. The plan called for an investment between $250,000 and $1 million. Pouladdej testified at the confirmation hearing that he would make the full $1 million contribution. At the hearing the court expressed a concern that net cash flow would be a negative $328,000 during the first two plan years. Pouladdej offered to increase his investment to $1,328,000. The court fixed the value of Beal's secured claim, found the plan feasible and confirmed it. The District Court placed a higher value on Beal's secured claim by adding accumulated postpetition rents, remanding the case to this court to reassess the plan's feasibility. This court has today issued a decision finding the plan to be still feasible notwithstanding the secured claim's higher value.

the heart of Beal's claim that BRF & G has a conflict of interest and, therefore, should be disqualified.

In March of 1996, BRF & G began representing Evelyn Carabetta in her efforts to maintain the Carabetta family's ownership of Building 6 in the Water's Edge complex, which was owned by CEI. At the time, control of Building 6 was the subject of a mediation between CEI and the mortgagee. When it became apparent that the Carabetta family would lose control of Building 6, Pouladdej retained BRF & G in his own efforts to acquire Building 6. Pouladdej was successful in acquiring Building 6 in the name of First Tower Funding, L.L.C. Subsequently, on May 27, 1997, he asked BRF & G to form Water's Edge Management Company to manage it.

Two months later, BRF & G was again retained by Pouladdej, this time to assist with his acquisition of Beal's mortgages on WELP's properties, namely Buildings 1, 2 and 5. BRF & G attorney William Baldiga attended a meeting with Beal representatives on Pouladdej's behalf. Pouladdej offered to purchase Beal's mortgages on the properties, but the parties could not reach an agreement.

On August 14, 1997, WELP retained BRF & G to negotiate with Beal on Beal's mortgage. BRF & G made a second attempt to transfer the property from WELP to Pouladdej. This second proposal was also rejected by Beal. BRF & G represented WELP during these negotiations; Pouladdej was unrepresented.

At the commencement of this case, BRF & G disclosed, as related, that it had represented members of the Carabetta family and affiliated companies on certain matters unrelated to this case. BRF & G represented Evelyn Carabetta on her claims against the bankruptcy estates of Joseph F. Carabetta and CEI, and in connection with her prenuptial agreement. BRF & G also disclosed its prior representation of Pouladdej in his purchase of Building 6 and in his attempted purchase of WELP's

properties on Beal's mortgages on them. BRF & G likewise disclosed that Evelyn Carabetta is employed by Carabetta Management Company ("CMC"), the management company affiliated with CEI that manages WELP's real property. BRF & G also disclosed its prior representation of Consolidated Properties, Inc. ("CPI") in connection with CPI's claims against CEI's estate and in connection with CPI's objections to certain professional fee claims asserted in the bankruptcy cases of Joseph F. Carabetta and CEI. BRF & G further disclosed its prior representation of Carabetta Management Company ("CMC") with respect to the possibility of rendering a legal opinion to CMC on a securities issue unrelated to WELP or this case, and that such engagement had been terminated prior to the commencement of this case.

BRF & G's representations of Evelyn Carabetta, CPI and CMC were each unrelated to WELP or this case and were all completed or largely completed as of the commencement of this case. In a supplemental disclosure, BRF & G disclosed that total time charges incurred since the commencement of WELP's case in March 1998 in representing Evelyn Carabetta and CPI was $4,043. All services rendered to WELP's affiliates were unrelated to WELP or its case. BRF & G has not represented any person or entity other than WELP since BRF & G was first engaged by WELP in August of 1997.

In this case, both of WELP's general partners were represented by independent counsel not affiliated with BRF & G. CEI was represented by Howard B. Kleinberg (of the New York law firm of Shaw, Licitra, Esernio & Schwartz) and by Connecticut Attorney Judi E.F. Weiss; Mr. Kleinberg also appeared for CEI's partner Joseph F. Carabetta. Another affiliate of WELP, CEI, L.L.C., was independently represented during this chapter 11 case by LeBoeuf, Lamb, Greene & MacRae, L.L.P. That affiliate, through

**6**

such independent counsel, opposed confirmation of WELP's Plan.

WELP's plan valued Beal's secured claim at substantially less the $29 million debt due to a collapse in real estate values shortly after WELP's apartment complex was built. The plan places each of Beal's secured claim and unsecured claim into its own separate class composed of just the Beal claim. It proposed to pay on Beal's unsecured claim a .1% cash payment plus a 1% interest in the entity to own the three buildings. Several classes of creditors supported the plan, but Beal and one other creditor voted against it. The court confirmed the plan under principles of cramdown which were affirmed by the District Court except as to the valuation of Beal's secured claim. *See Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership,* 248 B.R. 668, 678–88 (D.Mass.2000).

### The Conflict Issue

■■■ Section 327(a) of the Code establishes a two-part test which must be satisfied for an attorney to be authorized to act as counsel for a debtor in possession. First, the attorney must be "disinterested." 11 U.S.C.S. § 327(a) (Law.Co-op.1997). An attorney is disinterested as long as he "is not a creditor, an equity security holder, or an insider" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." 11 U.S.C.S. § 101(14)(A), (E) (Law.Co-op.1997). Second, the attorney cannot "hold or represent an interest adverse to the estate." 11 U.S.C.S. § 327(a) (Law. Co-op.1997). In their practical application "the twin requirements of disinterestedness and lack of adversity telescope into what amounts to a single hallmark." *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987).

The District Court, in the person of the Honorable Patti B. Saris, had the following to say in remanding Beal's disqualification motion:

BRF & G's extensive involvement with Pouladdej in *this matter,* as well as other significant matters (like the purchase of building six the previous year), raises a basis for concern about the firm's loyalties. In light of the prior representation of the plan sponsor in his unsuccessful efforts to gain control of the buildings at a meeting with Beal, one can hardly fault Beal for being queasy: Would WELP have negotiated a better deal with Pouladdej if WELP had been represented by another firm? A reasonable creditor might believe that BRF & G would place Pouladdej's interests above the creditors' interests. Any additional funds from the equity purchase could have been used to pay more of WELP's unsecured debt than the meager .1% the plan offers. The concerns about the appearance of conflict are particularly salient in this case because it involves a private sale of the equity in a single asset real estate limited partnership from a father-in-law to a son-in-law who had been represented by the same law firm on this and other real estate matters. The bankruptcy court's findings do not give me solace that it considered adequately the perception of a conflict.

Therefore, I remand the case to the bankruptcy court, which has firsthand knowledge of this case and is extremely experienced in chapter eleven reorganizations, to assess whether there was an actual conflict of interest or a potential conflict of interest which renders the lawyer's interest materially adverse to the estate or the creditors with findings of fact and conclusions of law.

*Beal Bank v. Waters Edge Ltd. Partnership,* 248 B.R. 668, 697 (D.Mass.2000).

■■■ In expressing these concerns Judge Saris understandably failed to take into account a somewhat overlooked dichotomy in the obligations of a debtor in possession and its counsel. A chapter 11

debtor in possession wears two hats. As observed by Judge Saris, it is a fiduciary of the bankruptcy estate, and as such owes fiduciary obligations to the unsecured creditors, the prime beneficiaries of the estate. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 353, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 644, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); *see also Casco N. Bank v. DN Assocs. (In re DN Assocs.),* 3 F.3d 512, 514 (1st Cir.1993); *I.R.S. v. Energy Resources Co. (In re Energy Resources Co.),* 871 F.2d 223, 229 (1st Cir.1989). Chief among these obligations is one of loyalty owed to the bankruptcy estate and the unsecured creditors so as to place the interests of creditors above its own. In this role a debtor in possession performs the same functions a trustee, exercising avoidance powers, selling property, objecting to claims, and so forth, all for the benefit of the bankruptcy estate and unsecured creditors. The Code expressly authorizes a debtor in possession to perform this fiduciary role. Subject to certain limitations not material here, the Code provides that "a debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this chapter." 11 U.S.C.S. § 1107(a) (Law. Co-op.1987). The general powers and obligations of a debtor in possession are accordingly based upon sections of the Code which refer to the "trustee."[3]

A chapter 11 debtor's obligations are quite different as to the plan dividend it proposes. In describing the role of a debtor in possession as plan proponent the Code contains no reference to the debtor as a trustee. Instead, the Code calls the debtor in possession "debtor" or plan "proponent." *See* 11 U.S.C.S. §§ 1121, 1127, 1129, 1142, 1144 (Law.Co-op.1987 & Supp. 2000).

There is a basic reason for the Code's failure to describe a chapter 11 debtor in possession as a "trustee" when referring to its role in proposing and confirming a plan of reorganization. A consensual plan (one accepted by all impaired classes of claims or interests) is typically the result of hard bargaining between the debtor and a creditors' committee. To be confirmed, the plan must give creditors at least what they would get in a liquidation under chapter 7. *See* 11 U.S.C.S. § 1129(a)(7) (Law.Co-op. Supp.2000). If they have plan proposal rights, creditors can propose a plan of their own which converts their debt to equity. *See* 11 U.S.C.S. § 1129(b)(2)(C)(ii) (Law.Co-op.1987). As equity holders, they can then sell the business and obtain its going concern value. In the plan negotiations, therefore, liquidation value is the floor for any dividend and going concern value is the ceiling. The difference can be considerable. And of course value under any standard is a slippery concept.

■ So there is plenty of room for bargaining. Beyond the minimal disclosure requirements of section 1125, the Code imposes no fiduciary obligations upon a debtor in possession in this negotiation process. The debtor is not required, for example, to disclose the maximum dividend it is willing to pay. Moreover, not all plans are consensual. A debtor may, as here, confirm a plan over the objection of a class of creditors if the plan gains the acceptance of at least one class of impaired claims and satisfies the other requirements for a so-called "cramdown" plan. *See* 11 U.S.C.S. § 1129(b) (Law.Co-op.1987). The self-serving nature of these negotiating and cramdown rights has been noted. *See, e.g., In re DN Assoc.,* 144 B.R. 195, 200 n. 22 (Bankr.D.Me.1992), *aff'd,* 160 B.R. 20 (D.Me.), *aff'd,* 3 F.3d 512 (1st Cir.1993); *In re Office Products of America, Inc.,* 136

---

**3.** A director of a corporate debtor in possession continues, under state law, to owe the debtor a duty of loyalty so as not to place his interests above the debtor's by, for example, having a third party he controls pay indebtedness owed him rather than its indebtedness owed the debtor. *See In re Cumberland Farms, Inc.,* 249 B.R. 341 (Bankr.D.Mass. 2000).

**8**

B.R. 983, 987–88 (Bankr.W.D.Tex.1992); *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr.D.Colo.1990); James F. Queenan, Jr., et al., 2 *Chapter 11 Theory and Practice: A Guide to Reorganization* § 11.36 (1994). There are nevertheless limits to what counsel can do in his efforts on the debtor's plan. *See, e.g., In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742 (Bankr. N.D.Tex.1988) (compensation of debtor's counsel reduced by 50% due in part to various actions of counsel designed to benefit debtor's principals, including the unsuccessful proposal of a plan beneficial to principal's nondebtor corporation, opposing creditors' committee plan which proposed 100% dividend and intentionally delaying chapter 11 case under a "scorched earth" strategy).

■ A debtor in possession is therefore permitted to place its own interests above those of the unsecured creditors with respect to what it proposes to pay under its plan. This is of course inconsistent with the concept that the debtor in possession is a fiduciary of the unsecured creditors owing them a duty of loyalty. The conclusion seems inescapable. As to its proposed plan dividend, a debtor in possession is not a fiduciary of the unsecured creditors owing them a duty of loyalty. Its bargaining and cramdown rights necessarily exclude such a fiduciary obligation.

It would be especially incongruous to treat BRF & G or WELP as a fiduciary for Beal concerning the dividend WELP proposes be paid Beal on its unsecured claim. Beal is an unsecured creditor only because its security is worth less than its debt. Like every undersecured mortgagee, Beal's decisions in chapter 11 with respect to its unsecured debt are driven by what is in its best interest as a secured creditor. It was partly because of that motivation that I permitted WELP to classify Beal's unsecured debt separately from WELP's other unsecured claims. This is reasoning with which the District Court agreed. *See Beal Bank v. Waters Edge Ltd. Partnership*, 248 B.R. 668, 691–92

(D.Mass.2000). So we are concerned here with whether to impose fiduciary obligations upon the representative of the bankruptcy estate in favor of a party whose motivations are to benefit its own security interest rather than the bankruptcy estate. Moreover, these same three parties, Beal, WELP and Pouladdej, were involved in hard prepetition bargaining on the payment of Beal's claim. No one would suggest they did this in the context of a fiduciary relationship. It is artificial to impose a fiduciary obligation upon them as to the amount of that payment merely because a bankruptcy petition has been filed.

■ WELP was therefore not acting in the role of a fiduciary in proposing to pay such a slim dividend to Beal. Relying either on its own funds or the funds of Pouladdej, it could offer unsecured creditors as much or as little as it chose, subject to the liquidation value floor. As WELP's counsel, BRF & G can have no broader responsibilities, other than professional ethical obligations not relevant here. And it follows that Pouladdej occupied no fiduciary position in acting as the sponsor and funder of the plan. Whether he was able or willing to provide funds to pay a higher dividend is immaterial.

■ Even if one were to consider BRF & G's prior representation of Pouladdej as creating a potential conflict of interest, "[t]he naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but makes it voidable as the facts may warrant." *Martin*, 817 F.2d at 182. Here, beyond what has already been said, the facts do not warrant disqualifying BRF & G. Any dealings between WELP and Pouladdej are necessarily subject to the relationship between Joseph J. Carabetta (WELP's principal) and Pouladdej, who are father-in-law and son-in-law. That relationship is a close and loving one.

In representing WELP, moreover, BRF & G gave no indication that its prior repre-

sentation of Pouladdej affected its services. Its services on behalf of WELP were of high quality throughout the case. What occurred at the confirmation hearing is particularly significant. When the court expressed concern about the plan's feasibility based upon a $1 million investment by Pouladdej, BRF & G had no hesitation in pressing Pouladdej for a greater commitment. As a result, Pouladdej agreed in open court to invest up to $1.5 million. These are hardly the services of counsel acting under the strain of a desire to serve the interests of Pouladdej as a prior client.

■ It should be stressed that we are concerned here with prior representation of a party in interest, and not the more serious problem presented when there is current representation of a party who has interests conflicting with those of the estate. *See, e.g., Rome v. Braunstein,* 19 F.3d 54 (1st Cir.1994) (concurrent representation of both debtor in possession and debtor's principal who had allegedly looted debtor); *Parker v. Frazier (In re Freedom Solar Ctr., Inc.),* 776 F.2d 14 (1st Cir.1985) (concurrent representation of debtor in possession, debtor's principal and new corporation organized by him); *Kagan v. Stubbe (In re El San Juan Hotel Corp.),* 239 B.R. 635 (1st Cir. BAP 1999) (representation of both successor trustee in one case and prior trustee in another case even though there was a damage claim against prior trustee for his negligence). Prior representation of a party in interest does not of itself create a conflict. Prepetition representation of a debtor does not prevent counsel from representing the debtor as a debtor in possession "solely because of [counsel's] employment by or representation of the debtor before the commencement of the case." 11 U.S.C.S. § 1107(b) (Law.Co-op.1987). Nor is there a bar against such employment "solely because of [counsel's] employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there

is an actual conflict of interest." 11 U.S.C.S. § 327(c) (Law.Co-op.1997). Yet Beal contends BRF & G's prior representation of Pouladdej (and other insiders) creates an impermissible conflict or the appearance of one. The contention is inconsistent with section 327(c) and 1107(b).

■ To be sure, appearances are important in determining whether an impermissible conflict exists. *See Martin,* 817 F.2d at 182. But any perceived appearance of conflict must be consistent with the statutory framework. And surely the appearance of conflict means more than the possibility that someone might perceive a conflict. A large measure of discretion is necessarily given the bankruptcy judge by reason of the judge's close familiarity with all the circumstances and counsel's conduct throughout the case. *See id.* at 182–83.

Additional considerations militate in favor of concluding that BRF & G had no conflict. Pouladdej was represented during the case by J. Robert Seder, an experienced and capable bankruptcy practitioner. Disclosure is also very important. *See id.* at 182. In its disclosure, BRF & G properly and adequately disclosed that it had represented Pouladdej or entities controlled by him prior to the commencement of this case in connection with certain limited matters unrelated to WELP and this case. In its disclosure, BRF & G also properly and adequately disclosed that it had represented, at WELP's request, Pouladdej at a single meeting with Beal on July 29, 1997. The purpose of this 1997 meeting was to permit WELP to introduce Pouladdej as a potential investor in WELP's properties and as a potential buyer of Beal's loans. During this meeting, WELP and Pouladdej worked cooperatively to attempt to achieve a common interest, the avoidance of a Beal foreclosure of WELP's properties through Pouladdej's purchase of Beal's mortgage loans or similar measures. There is no evidence that at any time, before or after the commencement of this case, Pouladdej was acting adversely to the interests of WELP's

bankruptcy estate or was acting in any capacity other than attempting to achieve, as plan sponsor, confirmation of WELP's Plan. BRF & G's vigorous efforts to gain confirmation of a plan of reorganization favored by WELP's management and owners was not improper or disqualifying. Nor is there any evidence that any of the Carabetta affiliates previously represented by BRF & G held adverse interests.

There is also no indication that BRF & G had extensive involvement with Pouladdej during the pendency of this case, except with respect to the joint efforts of WELP (BRF & G's client) and Pouladdej, as the plan sponsor, to gain confirmation of WELP's reorganization plan. Such joint efforts between a reorganizing debtor and a plan sponsor are not uncommon or improper, and BRF & G's representation of WELP in connection with those efforts were likewise not uncommon or improper.

■ The test is whether holding or representing the interest in question "created either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *Martin*, 817 F.2d at 180. I find, based on all the circumstances, that BRF & G's prior representation of Pouladdej, and other insiders of WELP, created no meaningful incentive for BRF & G to act contrary to the best interest of the estate and its creditors so as to place those parties at unacceptable risk. Nor did such prior representations create a reasonable perception of such an incentive. Pouladdej was working in cooperation with WELP as debtor in possession rather than asserting any claim or interest opposed to the bankruptcy estate.

### Procedural Ground for Denial of Motion

■ As I stated in originally denying Beal's disqualification motion, there are additional grounds for denying the motion which are independent of the merits concerning the alleged conflict. BRF & G

fully disclosed its prior involvement with the Carabetta affiliates and with Pouladdej, as well as Pouladdej's future role as plan sponsor, when it applied for employment on March 3, 1998, the date of the chapter 11 petition filing. WELP promptly served upon Beal notice of that application. The application was allowed on April 2, 1998. Beal filed no objection until the next day, 31 days after the application had been filed. The known practice of this court, consistent with our local rules, is to allow a motion or application within as short a time as ten days of its filing if no objection has been filed. *See* M.L.B.R. 9013(e). Here no order was entered for thirty days. Beal had ample time to object during this period and failed to do so. Its motion requesting the court to reconsider its April 2nd order, and its related motion for disqualification, which are in essence an objection to BRF & G's employment, necessarily have the same procedural defect. It is disingenuous for Beal to contend, as it has, that it was given no notice that Pouladdej was to be the funder of a plan until it read the plan.

Moreover, it was especially important that Beal act promptly. This chapter 11 reorganization was on an extremely fast track. WELP filed its plan of reorganization on March 23rd, only 20 days after the filing of its chapter 11 petition. WELP had good reason for such speed. Experience shows that the expense of a chapter 11 reorganization is proportionate to its length, and that a debtor's relations with its suppliers, customers and employees improve when a plan of reorganization is confirmed.

The District Court intimated that denying Beal's motion by reason of its late objection to the employment motion is tantamount to an impermissible waiver of a conflict of interest, citing *United States Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp.)*, 211 B.R. 699, 703 (9th Cir. BAP 1997), *appeal dismissed*, 162 F.3d 1230 (9th Cir.1998). But *S.S Retail Stores Corp.* was speaking of a waiver by

parties holding competing interests who are currently or were previously represented by the same counsel. *See id.* That is not the situation here. BRF & G never represented Beal. Beal had a mere right to object. Rights are lost every day for failure to assert them in a timely manner.

For the foregoing reasons, I affirm my previous denial of Beal's disqualification motion. A separate order has entered.